FILED
September 21, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002102414

13 pages

MEYERS LAW GROUP, P.C.
MERLE C. MEYERS, ESQ. CA Bar #66849
EDIE WALTERS, ESQ. CA Bar #
MICHELE THOMPSON, ESQ. CA Bar #241676
44 Montgomery Street, Suite 1010
San Francisco, CA 94104
Telephone: (415) 362-7500
Facsimile: (415) 362-7515

Prospective Counsel for CENTRAL VALLEY FOOD SERVICES, INC., Debtor

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

In re

CENTRAL VALLEY FOOD SERVICES, INC.

Debtor.

E.I.N. 68-0154873

Case No. 09-40214

Chapter 11

MLG-001

| | |
|---|---|
| Date: | September 22, 2009 |
| Time: | 8:45 a.m. |
| Place: | U.S. Bankruptcy Court |
| | Courtroom No.35 |
| | 501 "I" Street, Sixth Floor |
| | Sacramento, California |
| Judge: | Hon. Christopher M. Klein |

**DEBTOR'S MOTION FOR APPROVAL OF USE OF
CASH COLLATERAL ON AN INTERIM AND FINAL BASIS**

CENTRAL VALLEY FOOD SERVICES, INC, doing business as JACK IN THE BOX, the debtor-in-possession herein (the "Debtor"), hereby moves (this "Motion") the above-captioned Court for entry of an order, substantially in the form attached as **Exhibit "A"** to the declaration of Abe Alizadeh (the "Alizadeh Declaration") filed concurrently with this Motion (the "Proposed Interim Order"), pursuant to the provisions of Section 363 of the Bankruptcy Code and Rule 4001(b) of the Bankruptcy Rules, for the approval of the Debtor's use of cash collateral, on both an interim and final basis, to pay expenses necessary to maintain the Debtor's ongoing postpetition restaurant operations and administer the Debtor's chapter 11 case.

24021/20052

## I. INTRODUCTION

In particular, the Debtor proposes to use cash collateral of a secured lender, City National Bank ("CNB," or the "Secured Lender"), assert interests, namely the cash proceeds of all cash, accounts receivable and inventory held by the Debtor as of the petition date herein, in order to pay expenses of the Debtor in accordance with a projected budget as attached to the Alizadeh Declaration as **Exhibit "B"** (the "Budget"). Payment of those expenses, including certain prepetition employee wages and postpetition obligations owing to vendors, is critical to the preservation and value of the estate's primary asset – the enterprise operations of the Debtor's 18 Jack in Box restaurants (collectively, the "Restaurants") located in Central and Northern California.

CNB is owed approximately $8,600,000 and asserts security interests in particular assets, including equipment, inventory and accounts receivable, related to 17 of the Restaurants (the "CNB Collateral Restaurants"), as well as assets related to restaurants owned by one or more affiliates of the Debtor that are also debtors-in-possession before this Court.

By this Motion, and as detailed below, the Debtor proposes to use the revenues generated by the Restaurants in order to operate the Restaurants and to otherwise pay general and administrative expenses as set forth in Budget. As set forth below, the Budget's projections indicate that net of all expenses contemplated by the Debtor, the Restaurants will produce positive net cash flow, providing added protection to secured lenders and sources of eventual recovery for unsecured creditors. To the extent of particular lenders' security interests in those revenues, and up to the value of such security interests as of the petition date herein, the Debtor proposes to grant replacement liens in postpetition assets of the Debtor, allocated by restaurant, consistent with the provisions of Sections 363(c) and (e) of the Bankruptcy Code.

## II. JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are Sections 105(a), 361, 363, 541, 1107(a), and 1108 of the Bankruptcy Code.

## III. BACKGROUND

The following facts are established by the record of this Court and the Alizadeh Declaration filed concurrently herewith:

**A.   Generally**

1.   The Debtor filed its voluntary petition herein for relief under chapter 11 of the Bankruptcy Code on September 18, 2009 (the "Petition Date").  The Debtor continues to operate its business as a debtor in possession pursuant to the provisions of Sections 1107(a) and 1108 of the Bankruptcy Code, no trustee having been appointed.

2.   Affiliates of the Debtor, Kobra Associates, Inc. ("Kobra"), Food Service Management, Incorporated ("FSM"), and Sierra Valley Restaurants, Inc. ("Sierra") have also filed voluntary chapter 11 petitions for relief on September 18, 2009.

3.   Central Valley Food Services, Inc., the Debtor, was formed in March 1988 for the purpose of creating an entity that would allow the expansion of Jack in the Box in the Fresno, California area.  The Debtor's first acquisition consisted of four restaurants in Sonora, California. The Debtor currently owns and operates 18 franchises.

4.    The Debtor is owned and operated by Mr. Alizadeh, who holds a seventy-five percent ownership interest, and Austin Wallested, who holds a twenty-five percent interest.

5.   Mr. Alizadeh, a principal of the Debtor and its affiliates, has worked in Jack in the Box restaurants for over 30 years, first as an employee and then as a franchisee.  The Debtor and its affiliates, as a group, are now the second largest Jack in the Box franchisee in the nation, and Mr. Alizadeh has received numerous awards over the course of his career, including Franchisee of the Year in 2006 and 2007, by Franchise Times, and 2007 Top 200 Restaurant Franchisees by Franchise Monitor.

6.   The Debtor, FSM, Sierra and Kobra (collectively, the "JIB Debtors") together own and operate seventy (70) Jack In The Box restaurants in Central and Northern California, through multiple real property leases, franchise agreements with Jack in the Box Inc. ("JIB Corporate"), food and equipment supply contracts and other relationships with vendors, lenders and employees.  At present,  the JIB Debtors employ approximately 2,075 full-time and hourly employees, of which

roughly 47 full-time employees and 800 hourly employees are employed directly by the Debtor. The Debtor's present annualized revenues are approximately $39,925.500.00 and the overall annualized revenues of the JIB Debtors together is approximately $92,535,600.00 For the last fiscal year, ending December 31, 2008 the JIB Debtors reported net income in the amount of $5,691,516.00 on a consolidated basis. As of the Petition Date, the JIB Debtors owed approximately $17,890,000.00 in unsecured debt owed to hundreds of suppliers, vendors and tax authorities.

7. CNB also made additional loans to Kobra and FSM secured by an interest in 13 other Jack in the Box franchise restaurants.

8. As of the Petition Date, the Debtor employed approximately 30 full-time salaried employees and approximately 400 hourly employees. In 2008, the Debtor realized roughly $26 million in gross revenues. In this fiscal year, the Debtor has realized approximately $13,000,000 in gross revenues. The Debtor's obligations as of the Petition Date consisted of approximately $1,440,000 -- $8,600,000 to CNB -- in secured debt -- and approximately $5,800,000 in unsecured debt, owed to over 150 suppliers and other vendors, as well as city, state and federal taxing authorities.

B. **Need for Bankruptcy Protection**

9. The JIB Debtors have historically been profitable and independently viable, having reported net income of more than $18,500,00 in the last three reported fiscal years. However, a sizeable portion of the JIB Debtors' income has been used in recent years to subsidize operating losses in certain real estate ventures that are affiliates of the JIB Debtors. Those affiliates are now debtors in separate chapter 11 cases pending in the Sacramento Division, where a chapter 11 trustee has been appointed, and although all such uses of the JIB Debtors' income has long since ended, the prior use of funds left the JIB Debtors with insufficient cash flow and delinquencies owing to its own creditors.

10. Among other delinquencies, the JIB Debtors are in default to the California State Board of Equalization (the "BOE"), for several millions of dollars of unpaid sales taxes. As a result, on September 16, 2009, the BOE revoked the JIB Debtors' provisional licenses to operate their 70 restaurants franchises, and advised the JIB Debtors that those licenses would be reinstated only upon

CASH COLLATERAL ON AN INTERIM AND FINAL BASIS
24021/20052

the commencement of chapter 11 cases. The JIB Debtors were therefore compelled to close all of their restaurants temporarily until chapter 11 petitions could be filed.

11. The JIB Debtors then filed their chapter 11 petitions as quickly as possible, on September 18, 2009, in order to avoid further substantial disruption and harm to the restaurants' operations and enterprise value.

C. **The Chapter 11 Cases**

12. All four of the JIB Debtors filed chapter 11 petitions on September 18, 2009. Initially, the four cases were assigned to three judges in two divisions, but all have now been transferred to the Honorable Christopher M. Klein, in the Sacramento Division.

13. In chapter 11, the JIB Debtors intend to reorganize as soon as possible, through a consensual plan of reorganization. In order to assist in that effort, the JIB Debtors have conditionally engaged the assistance of bankruptcy counsel (Meyers Law Group, P.C., in substitution of counsel initially employed to file the debtors' petitions) and nationally renowned restructuring officers (Focus Management Group) who will have independent and exclusive authority over the JIB Debtors' cash flow management.

D. **NBA Loans**

14. In 2005 and 2006, the Kobra, Sierra and CVF entered into three loan agreements with NBA to obtain additional working capital and open additional restaurants: (1) Loan No. 9002, in the amount of $7,950,000, between Kobra Associates and NBA; (2) Loan No. 9003, in the amount of $9,347,000, between Kobra Associates and NBA; and (3) Loan No. 9001, in the amount of $3,200,000, between Abe Alizadeh and Austin Wallestad, as borrowers, and NBA, as lender (collectively, together with related notes and security agreements, the "NBA Loan Agreements").

15. Obligations owing under the NBA Loan Agreements are secured by eight commercial security agreements executed at various times by the Kobra, FSM, Mr. Alizadeh and Austin Wallestad. Mr. Wallestad owns 25 percent of the stock of the Debtor and Sierra. Those security agreements grant to NBA liens encumbering all inventory and equipment, among other assets, of 28 Jack in the Box franchise restaurants, 21 of which are the NBA Collateral Restaurants owned and operated by the Kobra. The remaining seven restaurants are owned and operated by FSM and Sierra.

16. As of the Petition Date, NBA was owed approximately $18,000,000, by the Kobra, FSM and Sierra jointly.

17. FSM, Abe Alizadeh and Kobra Alizadeh (Mr. Alizadeh's sister) each executed guarantees in favor of NBA with respect to obligations owing under Loans Nos. 9002 and 9003.

### E. Irwin Loans

18. In June 2004, the Kobra and Sierra entered into a series of loan agreements with Irwin: Loans nos. 007-0018405-100 through 110, each loan in the amount of $440,000, and Loan no. 18602-102 (collectively, together with related notes and security agreements, the "Irwin Loan Agreements"). Under the Irwin Loan Agreements, Irwin was granted liens encumbering all inventory and equipment, among other assets, of 12 Jack in the Box franchise restaurants, 11 of which are the Irwin Collateral Restaurants owned and operated by the Kobra. The remaining restaurant is owned and operated by Sierra.

19. As of the Petition Date, Irwin was owed approximately $3,700,000, by the Kobra and Sierra jointly.

20. FSM, Abe Alizadeh and Kobra Alizadeh each executed guarantees in favor of Irwin with respect to obligations owing under the Irwin Loan Agreements.

### F. The CNB Loan

21. In February 2008, the Debtor entered into two loan agreements with CNB to obtain additional working capital and open additional restaurants (collectively, together with related notes and security agreements, the "CNB Loan Agreements").

22. Obligations owing under the CNB Loan Agreements are secured by liens encumbering all inventory and equipment, among other assets, of thirty Jack in the Box franchise restaurants, 17 of which is the CNB Collateral Restaurant owned and operated by the Debtor. The remaining restaurants are owned and operated by FMS and Kobra.

23. As of the Petition Date, CNB was owed approximately $16,375,800 by the JIB Debtors, on a consolidated basis.

24. FSM, Abe Alizadeh and Kobra Alizadeh each executed guarantees in favor of NBA.

## G. Mechanics Loans

25. In November 2005, Central entered into a loan agreement with Mechanics Bank (the "Mechanics Loan") for funds to construct a Jack in Box franchise located Oakhurst, California.

26. The Mechanics Loan is collateralized by a security interest in the certain equipment located on the premises of the Oakhurst franchise. To the best of the Debtor's knowledge, Mechanics Bank does not assert any interests in the cash collateral of the JIB Debtors.

## H. PACA Liens

27. Vistar Corporation and its affiliates (collectively, "Vistar") assert a lien under the Perishable Agricultural Commodities Act, or PACA, against all of the JIB Debtors' assets, including cash collateral, in the amount of $282,912.53, senior to the secured claims of NBA, CNB, Irwin and Mechanics. That priority may be disputed by other lenders, and may be disputed by the JIB Debtors as well. Vistar also asserts a greater secured claim against certain assets other than cash collateral.

## I. Use of Cash Collateral

28. The Debtor believes that its proposed uses of cash collateral, as set forth in the Budget, are reasonable and appropriate uses, and that each of the secured claimants with asserted interests therein, NBA, Irwin, CNB and Vistar, will be adequate protected by the replacement liens proposed by the Debtor.

29. The Budget has been prepared on a conservative basis, including imposition of a 10% discount of expected revenues in order to account for the possibility of continued revenue losses occasioned by the JIB Debtors' recent disruptions in operations.

30. As set forth in the Budget, the Debtor estimates that it will produce net positive cash flow from its continued operations, after full payment of all postpetition expenses, so that none of the lenders' collateral (taking into account replacement liens) will be diminished by such use.

31. The Debtor's anticipated expenses proposed to be paid during those period include, among other items, the following expected costs:[1]

---

[1] To the extent that a proposed expenditure is not made in the time period projected by the Debtor, the Debtor seeks authority to make that expenditure in a subsequent time period in the same category and amount.

32. Normal store-level operating costs, such as payroll, supply purchases, rent and franchise fees;

    A. Wages and benefits earned by the Debtor's employees prior to the Petition Date, to the extent coming due after the Petition Date and equal to or less than priority claims that would otherwise accrue to those employees, subject to approval by the Bankruptcy Court which will be sought by separate motion;

    B. General and administrative expenses of the Debtor, incurred by the Debtor in the ordinary course of business; and

    C. Interim fees and expenses earned by the Debtor's substitute counsel, Meyers Law Group (up to $50,000.00 per month prorated among all four JIB Debtors), and the Debtor's independent restructuring officers from Focus Management Group (up to $25,000.00 per month prorated among all four JIB Debtors), subject to Court approval under Section 331 of the Bankruptcy Code, which will be sought by separate motions.

33. At least on an interim basis, the Debtor does not propose to segregate the cash collateral that it holds by individual secured claimants. Particularly in the short term, this is not practicable or necessary, because, given the Debtor's projected positive cash flow, each of the lenders will hold collateral by virtue of their replacement liens that are greater than the amount of cash collateral expended by the Debtor.

34. Instead, the Debtor proposes that each secured claimant, NBA, Irwin, CNB and Vistar, shall hold replacement liens in the Debtor's postpetition assets equal to the value of that claimant's cash collateral used by the Debtor, to the same extent, validity and relative priority as pertained to its lien upon the used cash collateral.

35. Since the commencement of the Debtor's chapter 11 case, the Debtor has initiated cash collateral discussions with CNB. CNB has cooperated with the Debtor and has provisionally consented the use of its cash collateral for limited purposes within the CNB Collateral Restaurant, including limited cash advances to hourly employees in order to avoid personal and catastrophic losses to those employees by virtue of delay in funding of their paychecks. NBA has refused to provide similar consents.

36. Absent immediate authority to use cash collateral on an interim basis, the Debtor and its estate will suffer irreparable harm, in the disruption of normal operations of the Restaurants.

37. The Debtor's ability to fund it continued operations as projected in the Budget is vital to the maintenance of the Debtor's value and that of the JIB Debtors' enterprise as a whole. Without the Debtor's proposed funding, its going-concern value is likely to be substantially and irretrievably diminished, as restaurants are required to close again, losing customers, employees, suppliers and other important partners in the enterprise. The Debtor therefore, seeks immediate authority to use the cash collateral as set forth in this Motion in order to prevent immediate and irreparable harm to the Debtor's estate, pending a final hearing pursuant to Bankruptcy Rule 4001(c).

## IV.  **RELIEF REQUESTED**

38. Based upon the foregoing, the Debtor respectfully requests that the Court enter an order granting the following relief:

A. Authorizing the Debtor to use cash collateral in which NBA, Irwin, Vistar and CNB have interests, on an interim basis through October 18, 2009, *provided* that no expenditures are made by the Debtor except as projected in the Budget,[2] and *provided* further that the Debtor's continued operations produce positive net cash flow, as projected.

B. Authorizing the Debtor to grant to NBA, Irwin, Vistar and CNB replacement liens encumbering all revenues generated by the Restaurants' operations after the Petition Date, in order to secure the value of cash collateral used by the Debtor after the Petition Date, as adequate protection for such use of cash collateral, *provided* that each such secured claimant's replacement lien shall have the same validity, extent and relative priority as its lien that encumbered the cash collateral so used; and

C. Following a further and final hearing of this Motion, authorizing the Debtor to use cash collateral in which NBA, Irwin, Vistar and CNB have interests on a final basis through an extended period set forth in a supplemented Budget.

---

[2] To the extent that a proposed expenditure is not made in the time period projected by the Debtor, the Debtor seeks authority to make that expenditure in a subsequent time period in the same category and amount.

## V. DISCUSSION

The Debtor respectfully submits that the use of collateral as proposed herein is proper and supported by applicable law, as follows:

### A. Each of the Secured Claimants is Adequately Protected.

Section 363(c) of the Bankruptcy Code provides that a debtor may use cash collateral if (i) the entity with an interest in the cash collateral consents, or (ii) the Court authorizes such use. 11 U.S.C. § 363(c). Furthermore, Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used ... or proposed to be used ... by the [debtor in possession], the court ... shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e). "The concept of 'adequate protection' is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in § 361." *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection.

Under Section 361, adequate protection may be provided by cash payments or additional or replacement liens. *In re Mullen*, 172 B.R. 473, 476 (Bankr. Mass. 1989) (disagreed with on other grounds). Here, replacement liens will provide the required adequate protection: The Debtor maintains a profitable business that has consistently generated profits for years, and is only burdened by payments to other entities that have ceased. Its cash flow is projected to be positive, and the Debtor has proposed to condition its use of cash collateral on continued positive results. As long as the Debtor's cash flow is positive, it is generating more cash than it is expending, and the secured claimants' replacement liens will more than cover the amounts expended.

In addition, the very act of preserving the value of the Restaurants by maintaining its operations will protect secured claimants' respective interests – it is apparent that a cessation of those operations would have an immediate, adverse impact upon the value of the collateral, and therefore the use of the cash collateral in and of itself will provide protection.

For these reasons, the Debtor submits that the secured claimants' interests will be adequately protected under the provisions of Sections 363(c) and (e) of the Bankruptcy Code, and that the proposed use of its cash collateral should therefore be authorized.

**B.   Authorizing Use Cash Collateral Is Necessary And In The Estate's Best Interests.**

It is well established that a bankruptcy court, where possible, should be flexible in applying an adequate protection standard to enable debtors to maximize value, "[i]n order to encourage the Debtor's efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard." *In re O'Connor*, 808 F.2d 1393, 1397-98 (10th Cir. 1987). For example, in *In re Stein* 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral, although the secured party was undersecured, because the court found that the use of cash collateral was necessary to the debtor's continued operation and the creditor's "secured position can only be enhanced by continued operation of debtor's business. *Id.*

The focus of the adequate protection requirement is to preserve the secured creditor's position at the time of the bankruptcy filing and protect the secured creditor from diminution in the value of its collateral during the reorganization process. *In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

As noted above, the Debtor requires immediate access to cash collateral to continue normal business operations. Facilitating the continued operations of the Debtor's franchise restaurants will allow the Debtor to maximize assets for the ultimate benefit of the Debtor's secured and unsecured creditors. For these reasons, the Debtor submits that authorizing the use of cash collateral is necessary and in the best interest of the Debtor's estate and its creditors, including NBA, CNB, Vistar and Irwin

Without use of the cash collateral, the Debtor would have no ability to operate its business, because it would be unable to pay its employees, vendors and others. As a result, without the use of cash collateral, the Debtor would be unable to maintain the value of the Restaurants, to the detriment of NBA, Irwin and all other creditors.

Courts have routinely held that adequate protection may be demonstrated by a showing that the going concern value of the debtors, or the value of the lender's collateral, is preserved by the debtor's continuing operations and use of cash collateral. See, e.g., *In re JKJ Chevrolet, Inc.*, 117 F.3d 1413, 1413 (4th Cir. 1997) (allowing use of cash collateral to operate automobile dealership as long as continued operations maintained the value of the business); *In re Snowshoe Co., Inc.*, 789

F.2d 1085, 1087 (4th Cir. 1986) (allowing use of cash collateral to operate ski resorts where trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operations); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 56- 57 (Bankr. N.D.N.Y. 1992) (finding secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on collateral property); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor entitled to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral).

Similarly here, the Debtor intends to use the cash collateral to operate its business. The proposed cash expenditures are necessary to preserve and maintain the value of the Restaurants and the interests of creditors. The Debtor's sole source of revenue is generated by food and beverage sales. Without the ability to purchase food and supplies from vendors, the Debtor's assets will become valueless.

Therefore, use of cash collateral in the manner proposed is absolutely necessary to preserve the overall value of the Debtor's ongoing enterprise and enhance the chances of a successful outcome of this case. If the Debtor is precluded from making expenditures necessary to maintain its assets, all creditors - secured and unsecured - will be harmed. This, in and of itself, justifies the relief sought herein. See, e.g., *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized," citing *In re Grant Broad. of Philadelphia, Inc.*, 71 B.R. 376, 386-89 (Bankr. E.D. Pa. 1987), affirmed, 75 B.R. 819 (E.D. Pa. 1987)).

Accordingly, use of cash collateral as proposed herein is both necessary and in the best interests of all creditors, including the secured claimants.

C. **Interim Approval Is Appropriate.**

Bankruptcy Rule 4001(b)(2) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary hearing on such motion, on an expedited basis, and to authorize the use of that amount of cash collateral as is necessary to avoid immediate

and irreparable harm to the Debtor's estate.  As stated herein, the Debtor also respectfully requests that the relief sought in the Motion be granted initially on an interim basis, through October 18, 2009, so that there will be no undue interruption of the Restaurant's operations for lack of funding..  Under the circumstances of this case, particularly given the adequate protection measures proposed herein, the Debtor respectfully submits that such interim relief is fully justified.

## VI. CONCLUSION

WHEREFORE, based upon all of the foregoing, the Debtor respectfully requests that this Court enter an order, substantially in the form of the Interim Order, granting the relief herein requested and such other and further relief as the Court deems just and proper

DATED: September 21, 2009

MEYERS LAW GROUP, P.C.

By ___/s/ Merle C. Meyers___
Attorneys for Central Valley Food Services, Inc.